May it please the court, David Galtney on behalf of Orange County. I would like to spend my time this morning addressing the issue the difference between episodic acts and a condition of confinement and specifically the lack of the type of evidence this court looks to in distinguishing the two types of cases that is there is a lack of proof of a pervasive pattern of deficiencies in the provision of medical care. Well just to sort of set the table a little bit as I understand it the jury found Orange County the jury found unconstitutional conditions of confinement and an episodic act and on judgment as a matter of law the district judge ruled overturned the finding on episodic act. Am I correct? You are correct your honor. And that is not an issue before us here. The plaintiffs are not challenging that district judge's ruling on episodic acts. You are correct your honor. They're challenging his ruling on wrongful death damages but not on episodic acts. That is correct. Thank you. And just to if I could your honor further frame the issue there are two other claims that are not before the court that were disposed of by the trial court. The first is there is no claim before this court of an inadequate training or inadequate supervision of the LVNs. The trial judge did not submit that claim to the jury. There was no objection and there has been no appeal from that denial. The second issue your honor that is not being challenged is that on motion for summary judgment defendants moved for summary judgment that the detention itself was not unlawful and in response excuse me your honor the plaintiffs said they do not assert claims against the county for unlawful detention. The importance then is and in response the trial judge says fine that's now a moot issue but you're not going to be permitted to raise it again. And that is in their statement to that effect is that 7371 of the appellate record. More importantly in this case plaintiffs have presented no evidence that Orange County unlawfully detained other pre-trial detainees. There is no evidence of a pattern of unlawful detainment. There is no challenge that pre-trial detainees going through a detoxing process in the observation cell were held beyond that for which they were lawfully permitted to be held. And in fact was there any evidence introduced at all with respect to any facts that are similar here where one who was in the detox bubble suffered any kind of injuries or was neglected in the same sense that this individual was. No they attempted to do that your honor but the two that they presented were not related to the observations though and in fact the trial court referred to them in denying the episodic acts or omissions claim and said that plaintiffs had attempted to prove a pattern of unconstitutional conduct your honor and had failed and that was one of the basis for the denial of the episodic acts and omissions claim your honor. In fact I say there is no evidence of a pattern of serious deficiencies your honor there is no evidence of a pattern period and that is the point that the trial judge made in denying both the failure to supervise. But I mean the jury did find did it not that they that you had a policy or practice of ignoring people in the same fashion that you ignored this individual who were hallucinating on drugs. They found that didn't they? They found that the county had a condition of placing detoxing. Had a custom had a custom of holding in coherent pre-trial detainees suspected of intoxicated intoxicated on alcohol or drugs in the observation cell until either the detainee was able to communicate with the officers sufficiently to allow the officers to fill out paperwork or until the next visit of the doctor. That is the finding your honor and in fact pursuant to trial courts instruction they found that. So how do you attack that finding? What is the essence of your argument that attacks that finding of the jury? The express policy your honor of the county is when they are detoxing if the condition worsens they are to call a doctor that is the instruction of the standing order that these nurses were following so when they what they what the county does is the first thing they do when someone is presented to them in an intoxicated condition at screening they have a screening policy. If they need to they send them to the emergency room. I thought the facts showed that that had never been done before. It had been done very seldom in which they called an additional doctor or called a doctor other than one that was supposed to make the routine visits. First of all on screening your honor the testimony was that it happened often and I can cite the court to that and in fact she gave an example of maybe fifty to a hundred in a year so when they come in as intoxicated if they are too intoxicated that's the point I'm making. I'm saying at which they're referred to the emergency room. Once they make the determination that they're going to put them in the detoxification cell. I thought that was with respect to drugs is that supposed to drug addicts? It could be any number of drugs your honor when they're presented to it and the you know it could be as in this case the arresting officer said he was on bath salts which you know take two days to five days to for the detoxification process to occur it could be alcohol it could be a combination it could be cocaine it could be any number of things and which and what they do your honor is they put them in a observation cell in the infirmary and it is the cell that is closest to the nursing's desk. It is a matter of feet from the nurses desk. The infirmary is staffed twenty four hours a day by a licensed vocational nurse who is instructed if this individual conditions worsen call the physician. Well how do they know? Again we just want to limit it to the testimony but as I recall from the portions of the record in the briefs it's a standard pattern when you're detoxing you throw up you have diarrhea you take off your clothes da da da da da so how can a nurse who's sitting outside and doesn't go into the detox to check on the person how do they know it's other than just the normal detox process? Again limit yourself to evidence in the record. Yes your honor and the evidence in all of the nurses testified to it that every situation is different it depends okay it depends on whether the individual took the drug or alcohol you know four days right before they came in or sometime before it depends on whether it's a heavy user it depends on whether you know it's their first time or what they took it's a number of different factors that determine how fast the individual would detox. But when they're going through detox your honor by definition the poison is leaving their body they're going they're watching them hopefully get better and what the testimony indicates in the record is that some of these individuals on bath salts or other speed methamphetamines things like that they will stay awake for days and then at the end they will start to slow down and fall asleep and when they wake up they don't even all the time know why they're there or what happened. And so that is exactly what the nurses anticipate was happening here now the standing order that the nurses have and they all testified that they follow the standing order and sometimes they're able to do this in this case they were not but it requires them to check the vital signs every four hours it provides them with what they drug that they can give them if the individual is having trouble with withdrawal. It's funny you had mentioned checking every few hours isn't the evidence at best that this person had his vitals checked once and that may not even be something that the jury had to accept. In this case your honor that is correct but again the distinction here is between an episodic accident omissions claim and a claim that there was something done wrong in this particular case. That is evidence the jury could use in figuring out what the reality of how this custom developed in the jail. So there's some evidence in this case or actually probably undisputed evidence that at best he was checked only once and the jury was entitled to infer from that from the overall evidence is introduced that maybe that was a better view of what goes on inside the bubble than what your people testified to. But actually I mean that fits your argument. I mean because your argument is it was pure negligence in this case correct. That's it your honor and here's the problem with taking and in Henson versus Wichita. That's your answer let's see what his answer is. Your honor if I could address that in Henson versus Wichita County. There were claims made for a condition of confinement based on the use of LBNs and last year. And this court specifically said it was not going to look at episodic acts in analyzing the condition of confinement claim. It set aside claims that were solely episodic acts in analyzing it as a condition of confinement and that's important. Why? Because in Hare your honor the court set up two distinct standards for distinguishing between what is in fact the rare case that the court identified in Shepard of a condition of confinement with a systemic failure of medical care that causes the harm versus in Hare what they were looking at was a episodic act or omission a specific act. And the difference is and the reason and importance for the difference in requiring proof of a pervasive prior conduct your honor is exactly to distinguish it from an episodic or as the courts as your honor said a simple case of negligence or in Hare they said even gross negligence. Well you have testimony from one of the LBNs that the plaintiffs point to that says she went through a variety of how the people who were put into the bubble act start screaming, getting sick, diarrhea. Then after several days they'll start slowing down. At first they'll take low cap naps maybe five minutes and eventually they just sleep for hours. It seems to me the jury could potentially have taken from that that we're not talking about episodic acts. We're talking about the people who are put in there. They do all these wild things. Maybe they're checked for vital signs. Maybe they're not. But that is the custom just to regardless of what's going on really inside the bodies of these individuals they're just watched and they do things that would frighten most of us. But the nurses and the custom of the jail is to just let the inmates go through all of that. And that was much to the very big mistake with Montana but it was the custom of the jail to do it that way. What about that? But not if the condition worsens your honor. All of the witnesses said all the nurses said they follow the doctor's standing orders. If the conditions worsen that's what they're there observing. The whole reason. I thought they put up paper to shield their view of him when he undressed. Instead of watching him they put up paper to block the view that they had of him in the bubble. And they no longer could actually watch him because they were offended by the fact of his conduct. It was not because they were offended your honor. They have this jail has both male and female inmates. And so if a female is in there who disrobes or if a male is in there who disrobes. There are female pretrial detainees male pretrial detainees in the facility. So what they do to protect the dignity of the individual as well as those who may be around them is to put up that. They now have a screen that they use for the same purpose. The record reflects they no longer use the paper. But the purpose was your honor is that they would be able to see them their top of them. But more than that your honor still even with that in place. This is the best cell for him to be placed in because it is the closest to the nurse. They can easily they can hear him they can easily access the door and they checked it every 30 minutes. This is better than putting him in a medical isolation unit or some other use unit for the purpose of detox. Is it also correct that he stayed in there five days and was not allowed it was not taken to the bathroom and was not given any food. This individual well he was given food your honor. He was given food three times and he was given a large glass of drink. And what what he do his drug was thinking is that they were trying to poison him and so he would throw the food. But the end of the pathology he would take sips of water and then throw the food saying they were trying to poison him. But the witness they take him to the bathroom or anything. What they do your honor with an individual who's going through detox is they if they need to go to the bathroom they take them out. If they if they can't invite them out they try to entice them with cookies or something to get them out. In his case he was afraid of them. And so the choice was how do we get them out. Do we go in with force. And if they go in with force your honor they have to go in in a situation where they go in with another individuals so that they don't hurt him or the officers. And that's the problem. And so the decision this particular case was they did not bring him out. They should have. The lieutenant said at some point she would have brought him out. That was a mistake. Yes. But it was not. Again. Did they try to bring him out. No they did not. In this case your honor. Before your time is over would you state for our recording and also so that it can be directly addressed by counsel for plaintiffs. What was the county policy that was found unconstitutional. State it. The county policy was placing an individual in a detoxification cell which is an observation cell four feet or about that distance. Not four feet but a distance from right there in front of the nurses. That is a station that is staffed 24 hours a day by LVNs who checked him every and check all the detoxing employees every 30 minutes inmates every 30 minutes to allow them to detox. And if their condition worsens to call the emergency room call a doctor. Seek medical help. That is what they are there to do is to observe them to make sure that their condition. No sir. I want you to state the. Isn't there a written policy. Yes. I'm sorry. State the written. OK. The health insured. Some of my notes I didn't get there. The health. There is a health care plan that was that requires that anyone in need of emergency care be taken to the emergency room. It is a very lengthy health care plan that was approved by the state agency that inspects that improves these things. And as this court this court had looked at a very similar policy in Cardenas an unpublished opinion. But it looked at a very similar policy and said that was an explicit policy and express policy to provide medical care to detainees. And I've been answering Judge Barksdale question. I mean the jury doesn't even refer at all to the policy that you have stated. But they found you had a custom of holding incoherent pretrial detainees suspected of being intoxicated etc. In the bubble until the detainee was able to communicate or a doctor came back. That is what they say. That's the policy they found. And the question is whether evidence supports that that was their policy or not. And your honor my point is that in order to prove that policy. They had to show prior instances in which the doctor was not called when someone can someone's condition worsened. There is no evidence of that. They have to show a situation where there were failures of medical care failures to show take vital signs failures to provide other than this one particular case. There's a total lack of proof of a pattern of pervasive misconduct. So you're saying there wasn't a policy of the custom. Now I'm saying there is an express policy this court in a written policy. Yes. Well then how can you tell Judge Jolly that's that's not the policy. I want to know what the policy is the written policy. I guess I'm not communicating. There is a express written policy your honor. It is a health care plan to provide medical care. It is an emergency to take them to a doctor emergency room. The nurses all follow a standing written order. There is a in place written health care plan. What the plaintiffs tried to prove was despite that plan. Despite that express written plan. There was a custom that is an unstated policy. That is a practice that despite the custom to call a doctor. I mean the policy to call a doctor despite that there was a custom. And this court has always said that in trying to prove an unstated custom. That is contrary to an express policy that the court looks for evidence of prior pervasive misconduct. Prior instances other than this particular case. Are you arguing that unless it can be shown that somebody else died. Even if this was the custom just to let them work it out the best they could. Unless somebody died from that. The evidence fails. No your honor I'm not. But what they at least need is evidence that there was a failure to call a doctor. In another detoxing situation where the condition worsened. Whether they died or not. At least need that there was a failure to supervise in some. At least show that there was some other act or incident. Some other pattern of proof of a prior misconduct. That is simply not present in this case your honor. And that is. That is our argument. And I will reserve my time for rebuttal. Thank you. Okay Mr. Galtner thank you. You've saved some time for rebuttal. And Ms. Stetson we'll hear from you. Representing Mr. McDonough. Yes sir thank you. May it please the court. It's my honor to be here this morning to represent the family of Mr. Montano. Just as a matter of procedure. I'm here this morning to present our response to the appellant's brief and our response. And we've reserved five minutes of our time so that Mr. Bernson can address the cross appeal. Directly to answer Judge Barksdale's question. The written policy. Can you hold your voice up just a little bit. The written policy of this county was state approved. And it required the nursing staff and the jailers to allow four to eight hours for detoxing inmates. What we proved to the jury. Eight good citizens of the Eastern District of Texas. Is that instead of the state approved written policy of four to eight hours for detox. Every single jail official testified. That their custom was to bring in incoherent delusional pretrial detainees. To put them in the bubble. And leave them there. Until one of two things happened. Either they sobered up enough that they could communicate to jail officials that they needed a doctor or that they were fine. Or that the contracted jail physician might come by. And I say might come by because the evidence in the record was very clear. That there was no standing day that the doctor came by. What you seem to be saying to me is that the policy was as you stated. And that was the policy that was followed. And he said they had a policy that was quite different from that. And you're not even arguing custom. Are you arguing that they had a policy or a custom? Well, I'm not arguing that they had a written policy that says put them in the detox facility and leave them there. What every single jail official testified to, including the sheriff, was that it was their custom. That's the way they did it. Did you show any other instance of anything similar to this instance occurring? No, we did not, Your Honor. And I do not believe that we're required to. Well, then how could it be a custom if there is no pattern? I mean, to hold a county liable for this particular conduct, absent a particular policy, and you're not relying on the policy of the sheriffs for liability. You're relying on a custom. But you haven't proved a custom because you've not proved a pattern. What do you say about that? We do believe we proved a custom to the jury. Judge Clark agreed with us in his interpretation of the Shepard case that a custom, if you are following the pattern of behavior, the pattern evidence, the pervasiveness evidence, is necessary if you cannot, under the Hare case, point to a rule or restriction. But that Judge Clark understood that Shepard did not say that you must always prove a custom through a pattern of behavior. So is that the legal issue here? Whether one has to prove a pattern in order to establish a custom that will hold the county liable for this conduct? Yes, sir. That's the issue in this case, from your point of view? Yes, sir. And I believe Judge Clark, in his rulings on the motions for judgment as a matter of law, you're saying that if we hold that you have to have a pattern to establish a custom and we find that there was no pattern, then you lose and we reverse the $3.5 million verdict? Well, I suppose that's entirely possible for you to do so. But I believe that if you follow the en banc opinion in Hare, and it dictates for the Bell test, and, of course, we're talking about the Bell test because we have a pretrial detainee who you may not punish, right, under Bell v. Woolfish. So what Hare tells us is, for the Bell test to apply, a jailer's act or omission must implement a rule or restriction or otherwise demonstrate the existence of an identifiable intended condition or practice. If a pretrial detainee is unable to point to such an established rule, then he must show a custom or an act or omission that was sufficiently pervasive. And what Judge Clark told us was he didn't read, and nor do I, Shepard to say that an admitted testimony of a jail official would never be sufficient to show a custom. And in Shepard, they didn't have the admission from the jail that this is how they provided medical care. But we have that here. Each and every individual testified that when Robert came in and anyone else like Robert, they were going to go in the bubble and they were going to stay there for as long as it took, five days, six days, ten days. Well, they say the policy is obviously to the contrary. Was there evidence from either side of inmates in the bubble who did start to have serious medical problems and they were addressed and an ambulance was called? Is that in the record is all I'm asking? I believe that some of the nurses attempted to testify. No one testified to any specific incident of when someone else was in the bubble and taken to the emergency room. No, sir. Let me make clear what I'm asking you to pick up on. The argument from opposing counsel is there's no evidence of the kind of custom that you're talking about. What I'm saying is there any evidence of their policy being implemented in the way that they're arguing that it says that an inmate after a day or two, the vitals have been checked and something serious is going on, an ambulance is called, anything else that would fit within the policy as they say it exists? No, sir. I don't believe so, not from the record, not from the testimony offered by the nurses or the jail officials. You know, what we were required to show in the condition of confinement case was three things. Evidence of the rule of restriction, the condition, that it wasn't related to a legitimate governmental objective and that it was the moving force behind a constitutional violation. We believed, and Judge Clark agreed with us, that the admitted, repeated, and consistent testimony of the jail officials of their custom was sufficient to allow the jury to answer the question about was this, in fact, their custom. Then when we get to whether or not we put on sufficient evidence that this custom was not reasonably related to a legitimate governmental objective, what we have before your honors here now is a plain error review because as Judge Clark ruled, the county failed in their Rule 50A to object to sufficiency of the evidence with respect to legitimate governmental objective. We know that you're required to. They brought it up in their Rule 50B, but they did not bring it up in their Rule 50A. So now here on appeal, the question is plain error. Was there any evidence of the absence of a legitimate governmental objective? What Judge Clark pointed to in his ruling on the Rule 50B was first the affidavit of probable cause, which put the county on notice that you cannot continue to hold a pretrial detainee for just some unknown length of time. But your honors, I think what the jury probably found most instructive on the fact that their custom was not related to a legitimate governmental objective is the fact that their admitted custom was so far removed from the state-approved written policy of four to eight hours for detox. Each and every one of the jail officials acted as though that written policy was of no bearing whatsoever. So on that evidence, the jury certainly could have concluded that their custom of holding someone for five, six, seven days, waiting for essentially them to heal themselves, was so far removed from the state-approved policy that it was purposeless. But Mr. Galtner did say that there were several instances and there was testimony to the effect that ambulances had been called, doctors had been consulted in instances that were quite different from this, and they got immediate medical attention. Well, I think what Mr. Galtner was referring to is that at the screening process there were times, and although I don't recall there being any specific evidence at trial, but I think what he was suggesting is that at the screening process there were times when someone might be, instead of admitted into the jail, they would be sent to the hospital for medical clearance. But it's very clear that once their custom was, once they made it past that medical clearance, they were going into the bubble and they were staying there until either they became coherent enough to communicate and finish the bookend process or the doctor came by. I don't believe there was any testimony of patient X or detainee Y who, after two or three days in the bubble, we realized he was having some episode and we took him to the hospital. I don't believe there's any record testimony of that. So once we've gotten past the fact... Let me ask you this. Is there any evidence of someone, application of this custom as you understand it existed, having some injury short of death? Whereas an emergency condition arise, a serious medical condition arise, was there any evidence of something short of what happened to Mr. Montano? No, not through a specific detainee. No, sir. So when we look at this record, we'll see maybe or maybe not the evidence that supports the policy as you say it existed, but there'll be no evidence of it adversely affecting anyone else other than being put in that kind of condition, being put in that kind of confinement. No, sir. I don't believe you're going to see any evidence in the record of someone else in Robert's condition having had a serious injury or death. But again, once you've established that there is in fact a condition and the jury found there was a custom of holding incoherent, delusional pretrial detainees, basically waiting for them to heal themselves, once you've established that the custom exists, the condition exists, then the question under Bell is whether that custom, as it is applied to a pretrial detainee, is that punishment. And we don't look at the intent. It doesn't matter whether they intended to punish him or intended to harm him. What Hare tells us is even if the state did not intend to harm him, it is the imposition of the condition, the custom alone, that we get the presumption of punishment. At trial, was there any effort on the part of the defendant to try to explain the egregious conduct or absence of any response to this man's condition? I mean, it just seems like an awful, awful thing that happened, but yet is there an effort to try to explain why it happened? If it had not ever happened before, why was it? Their effort to explain why they did what they did was that they were following their custom. We always did it this way. We always put people in Robert's condition in the bubble, and we waited. Now when you say there, tell us who there is. Who testified? Yes, ma'am. So there were four LVNs. Give us their job description. Okay. There were three LVNs and a supervising LVN. So you have Nurse Glendy, Nurse Permenter, and Nurse Dickerson. And over the course of five days, Robert had a fair amount of interaction with each one of these. Then there was an LVN supervisor, and her name was Patricia Waters. She was a supervisor, but she was simply an LVN. Then you have the officers, Officer Lucia and Officer Towns, who had some participation in his bookend process. Once they brought him in and made the decision not to call a doctor, not to call his mental health care provider, not to send him to the hospital despite his condition, they really didn't have much more contact with Robert after that. It really was the four LVNs who I identified. You said LVN. LVN. A vocational nurse. What is a vocational nurse? Typically, a vocational nurse is someone who's had about a nine-month to one-year certificate program. For example, here and there in Beaumont, Texas, they would attend Lamar Institute of Technology, and they would have about a nine-month program where they're trained to take down medical information. They're not allowed to diagnose. They're not allowed to treat. That's somewhere between LPN and RN. Typically, an RN would have a four-year RN degree. And a practical nurse would have. Right. Now, these were basically information gatherers assess and report to the physician. Of course, we can take judicial notice of what an LVN is, but I understand an LVN is just a special term used in Texas and California. It's the same as a LPN, licensed practical nurse. Well, I apologize. I don't know what a licensed practical nurse is and what all of its definitions are, but you're right. An LVN is specific to Texas. But you also said the sheriff testified to what you call this unconstitutional custom. Yes, he did, Your Honor. His testimony was that the custom described of holding delusional, incoherent pretrial detainees, his testimony was we were going to hold them as long as it took until they detoxify. And if you are looking for his testimony, that would be on the record on page 13550. Your Honors, I see my time is up. I think we've answered your questions. So we'll hear from Mr. Brunson. And what is the subject you're going to address, Mr. Brunson? I'm going to address the wrongful death, approximate cause issue. And may it please the Court, Mr. Galtney, at the beginning of this, my discussion, I want to say that I'm going to go straight to the Hare case to talk about what a condition of confinement. And that the Court has ruled and Hare has stated that unlike an episodic acts or admissions claim, confinement is different, that to prevail on a condition of confinement claim, the plaintiffs do not have to show that the sheriff or the state or whoever, as a policymaker, was deliberately indifferent. And this is going to be very, very important. And the Hare said, thus, a true jail condition case starts with the assumption that the state intended to cause the pretrial detainees alleged constitutional deprivation. And they said that this standard is a functionally equivalent to deliberate indifference. And why is that important? Because on a show where I think Judge Clark went wrong and my friend David Galtney went wrong, if you look on Judge Clark's document 219, page 26, he says, the defendant has, we play it, said that the defendant has conceded the causation issue in the jury argument, in which you can do that in the jury argument and make it a judicial admission. And then if you follow the Court's reasoning, it goes over and it says, thus, when analyzing the action or admission of particular jailers or nurses, the test is not whether its negligence caused the death, but rather the issue is deliberate indifference to Robert Montano's medical needs caused the death of Robert Montano. I read that wrong. Rather the issue is whether the deliberate indifference to Robert Montano's medical needs caused the death of Robert Montano. That's incorrect because Hare says you don't have to prove deliberate indifference. And if you go one step further on Judge Clark's. You know, our review is de novo, so obviously we read the opinions by the district judges, but we don't give deference to his ruling. Why don't you tell us why, but for this, what you call unconstitutional custom, he would have survived. Yes, sir. You're arguing wrongful death damages, aren't you? Yes, sir, I am. Well, you ought to get to it. You've used up three minutes. Okay. Well, I'll be quick then. On the verdict form it says a custom of holding incoherent people, pre-detainees, pretrial detainees, was a moving force leading to inadequate medical care. The issue is approximate cause, and then, of course, but far. The issue is that when the counsel got up to discuss it on jury argument, after we put on a nurse who said that conditions of confinement caused, because they weren't treating the detainees, that that caused their death. But the defense counsel, in an effort to mitigate the damage that was caused by the testimony, and Judge Jolly, you're correct, the testimony was they put this man, they stripped him, put him in this cell without toilet paper, water, and left him for five days. And he slowly deteriorated in front of them to where he was crawling on all fours with feces and all kind of mess on him, crying, moaning, saying, help me, get me out, call 911. Let me stop you. We're not a jury. I understand. But you've got very little time. So tell me, why didn't you put on evidence at trial by a medical expert that, but for this confinement, he would have lived? I think we did, Your Honor. Well, what? The nurse and the doctor, Goldstein. They said that but for the lack of medical care, he would have lived. And who is Dr. Goldstein? Goldstein was a doctor that testified in the trial that Ms. Stetson put on that talked about the conditions and renal failure, et cetera, and it's in the record in the limited time. But I do want to mention this real quickly because I think the counsel gave a judicial admission. He said that he shouldn't have died, Mr. Montano shouldn't have died, which implies that he could have lived if treated. He said it was medical negligence. He said it was grossly negligent. He says it was caused by renal failure. It was in our hands and he shouldn't have died. What does a jury got there? They said that we caused it. And what counsel did is trying to conclude, and I've done this before, is that in a negligence case I've gotten up and said, well, we killed him. My client killed him. I did defense work. It was by mistake or accident, but it wasn't gross negligence. And I'm trying to mitigate the testimony. That's exactly what the county did. They tried to mitigate the testimony against him, and so they conceded proximate cause in an effort to try to get to the deliberate indifference, and they didn't get there. And I think that they gave a judicial admission as to proximate cause, and when you put that with the nurse and the doctor, I think we're there on wrongful death. Thank you. Thank you very much, Mr. Bernstein. Mr. Galtney, you have some time for rebuttal. Thank you, Your Honor. Just briefly on that, I just disagree with the counsel on what the record shows on the doctor, and so did the trial judge. The trial judge said that if the question, if the evidence could have been put on, that, in fact, he would have survived. Surely that question would have been asked, and it wasn't. And so I'll just let the record speak for that, Your Honor. The trial court was correct in denying the wrongful death damages. There's a fair amount of statements, though, that go into the argument about a concession on whoever is making the closing argument to the jury. What do you say to that? What the trial court specifically noted was, in arguing it, what trial counsel is trying to distinguish between was a negligence case, which the court knows is not a due process violation, and an episodic act involving subjective indifference or the conditions of confinement. It seems to me you waited too late to raise that issue, about whether the renal, is that what you're arguing, the renal failure versus the conduct of the jail was the cause of his death? Is that what you're arguing now? Is that what this is all about? No, Your Honor, I was trying to respond to the court's question. The particular argument that he made was specifically that the condition did not cause the death. I mean, that's the language. The condition of confinement. Did not, did not cause the death. That's the language that was specifically stated in closing argument. Because your defense was it wasn't our custom or policy or anything that caused the death. It was negligence by these LVNs. That was your position in trial, wasn't it? That was the argument that the counsel was making, was trying to distinguish between a condition and a constitutional violation and something that doesn't rise to the level of a due process violation. Specifically, Your Honor, you ask about whether there is anything in the record about someone actually being provided care. Plaintiff offered three files. There is one, and I wish I could remember the name of it right now, where an individual was already in the jail, okay, and he reported problems and told the nurse, in addition, that he had been on cocaine and marijuana. And so she put him in the observation room for observation. It's the purpose of the observation room. Took his vital signs and sent him to the hospital. So not only... But this gets back to her point about it being screening. Would you agree, I mean, I like that label, but this is the initial intake? Yes, Your Honor. And it was determined at that time, so it wasn't watching him over several days? That was not a screening situation that I just referenced, Your Honor. That was a situation where they were already in. But not in the bubble. But they were put in the bubble. Right, so they were in jail in some other cell, moved to the bubble after this determination was made. And the doctor was called at that time. They followed the protocol. They followed in the observation cell of someone detoxing. This person said he was on drugs. Okay, so that's one. You said there were three, but that's the only one you put in? The other three were not related to the observation bubble, Your Honor. Okay. And we didn't put that into evidence. They did. The other thing I would say is this is not a lack of effort on their part, Your Honor. They were provided 340 inmate files, and they did not show a single one to either one of their experts in an effort to prove a pattern. Again, to use the trial court's languages on the wrongful death, if the evidence had been there of a prior incident, they would have produced it to their experts. But again, it's not an oversight. This jail is inspected every year by the state. The state inspector testified in this case. When they go in there, they pull 20 or 30 files. Actually, the reports show they sometimes pull 40 medical files randomly, and they look through them. And if there had been a pattern, they would have failed the inspection. They did not. They passed the inspection every year. Your Honor, this was a tragic situation. But this is not a constitutional violation. The county has a system of monitoring by two doctors. They have two doctors that supervise the infirmary that are there once a week, at least once a week they are to be there. They have five LVNs. Unlike in the Henson case where when the LVNs went home, the correction staff monitored, these are monitored 24 hours a day, seven days a week by LVN staff. That exceeds what this court said was constitutional conduct in the Henson versus Wichita County case, Your Honor. I would just close by saying that this case does not fit within the type of case that the court, since Hare, an en banc decision, Scott, an en banc decision, of the type of pervasive pattern of misconduct that the court looks to in distinguishing between an unconstitutional condition of confinement and an episodic act or remission case. And with that, Your Honor, we would ask that the court render judgment. I take nothing in judgment. Okay. Thank you, Mr. Galton. Thank you, Your Honor. The court will take about a 15-minute recess before we take up the remaining cases.